**SO ORDERED.**

**SIGNED this 17 day of April, 2012.**

_J. Rich Leonard_

**J. Rich Leonard**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

IN RE:

**DAVID L. HINSON and**
**DEBRA A. HINSON,**

     **DEBTORS.**

**CASE NO. 10-07415-8-JRL**

**CHAPTER 13**

---

**DAVID L. HINSON and**
**DEBRA A. HINSON,**

     **PLAINTIFFS**

     **v.**

**COUNTRYWIDE HOME LOANS, INC.;**
**BANK OF AMERICA CORPORATION;**
**BAC HOME LOANS SERVICING, LP; THE**
**SHOAF LAW FIRM, P.A.; FEDERAL**
**NATIONAL MORTGAGE ASSOCIATION;**
**SUBSTITUTE TRUSTEE SERVICES, INC.,**
**in its capacity as Substitute Trustee; and C.T.**
**SALYER, in his capacity as Substitute**
**Trustee,**

     **DEFENDANTS.**

**ADVERSARY PROCEEDING**
**NO. 11-00328-8-JRL**

## <u>ORDER</u>

On September 13, 2010, David and Debra Hinson ("plaintiffs") filed a chapter 13 petition.

On September 30, 2010, the plaintiffs filed an adversary proceeding against Countrywide Home Loans, Inc. ("Countrywide"), Bank of America Corporation ("BAC"), BAC Home Loan Servicing, LP, The Shoaf Law Firm, P.A. ("The Shoaf Law Firm"), Federal National Mortgage Association ("Fannie Mae"), Substitute Trustee Services, Inc. ("Substitute Trustee"), and Christopher Salyer. This matter came before the court on defendants, Countrywide, BAC, Bank of America N.A. ("BANA")[1], and Fannie Mae's (collectively "bank defendants") motion to dismiss the plaintiffs' complaint ("complaint"). A hearing was held on February 21, 2012 in Wilmington, North Carolina.

## BACKGROUND

A.    **Facts**

### 1. The Countrywide Loan

The complaint alleges that in 2001, the plaintiffs subdivided the 7.12-acre tract on which their home was situated into two separate tracts, consisting of a 2-acre tract on which their home remained, and a 5.12-acre tract. This subdivision was recorded in the Brunswick County Registry. The plaintiffs sought a loan from Countrywide, to be secured by the 2-acre tract. The plaintiffs assert that Countrywide and/or its representatives knew that the property at issue was the 2-acre tract.

On or about May 10, 2007, the plaintiffs entered a loan agreement with Countrywide. An

---

[1]The Defendants asserted in their memorandum in support of the motion to dismiss that BAC Home Loans Servicing, LP merged with and into BANA, and that BAC Home Loans Servicing, LP no longer exists. The parties did not raise any issues regarding the correct identification of the defendants in this adversary proceeding, and any objection on these grounds is deemed to have been waived by the parties and will not be raised by the court. For purposes of this Order, BAC Home Loans Servicing, LP and BANA will be treated as the same entity.

attorney from The Shoaf Law Firm came to the plaintiffs' home to execute the loan documents. At that time, the plaintiffs state that they noticed that the legal description was missing from the deed of trust ("deed"). The attorney reportedly assured the plaintiffs that the description of the 2-acre property would be attached prior to recording the deed. The deed that was subsequently provided to the plaintiffs did not include a property description. The deed of trust that was recorded in the Brunswick County Registry does not describe the agreed upon 2-acre tract, but rather describes the original 7.12-acre tract.

### 2. The Attempted BAC Loan Modification

Plaintiffs assert that they began to fall behind on their mortgage payments to Countrywide and thus sought out a mortgage modification from BAC, through the Home Affordable Modification Program ("HAMP"). In order to receive a HAMP modification, the plaintiffs allege that they faxed to BAC several times, all the documents that BAC requested, but that on numerous occasions, BAC representatives nonetheless told the plaintiffs that some of the required documents were missing. Plaintiffs called BAC repeatedly to little or no avail, and received no written response on the status of their application. BAC representatives allegedly gave the plaintiffs conflicting information, at one point telling Mr. Hinson that he did not qualify for the modification because he "had his church clothes dry-cleaned," and at another point telling the plaintiffs that their loan modification was subject to "investor approval," and also that if they filed for bankruptcy, their "investor" would not approve. These are just a few of the incidents of deception, misconduct, and mishandling of their HAMP application alleged by the plaintiffs.

### 3. First Foreclosure Attempt

While the HAMP application was pending on March 30, 2010, the Substitute Trustee,

initiated a foreclosure proceeding before the Clerk of Superior Court in Brunswick County

("Clerk").  In that proceeding, the Substitute Trustee presented evidence that BAC was the

holder of the plaintiffs' loan.  The plaintiffs attached to their complaint an affidavit that was

included in the Substitute Trustee's evidence at that proceeding, which was purportedly executed

by an officer of "a corporation," swearing that "[c]ontact with the [plaintiffs], including written

communications, has been made in a good faith effort to resolve the delinquency voluntarily.

Forbearance, modification and other resolution plans have been considered.  The delinquency

has not been resolved."  After the plaintiffs advised the Clerk that they had not received

confirmation of their HAMP application, the hearing was continued until July 29, 2010.

### 4. Continued HAMP Negotiations With BAC

The plaintiffs maintain that they continued to try and discern from BAC the status of their

HAMP application to no avail.  In July of 2010, the plaintiffs assert that they were told for the

first time that they were required to update their employment and wage information every 90

days.  However, printed material accompanying their HAMP application advised that they

should notify their servicer only if there were material changes in their wage or employment

status. As a result of this new information, the plaintiffs again submitted a completed HAMP

package.  BAC again told the plaintiffs that their package was incomplete.  The plaintiffs assert

that the alleged missing information had in fact been included in their package.

On August 18, 2010, the plaintiffs received a proposed loan modification agreement from

BAC. The plaintiffs alleged that the modification was "less than helpful," because although it

reduced the interest rate to two per cent, the rate increased over years five to eight.  As a result of

the accrued interest and other costs associated with the foreclosure, the payment amount in eight

years would be the same as or greater than their current payment.  Furthermore, the modification would add $40,930.88 to the balance of the loan, and would extend the loan term to forty years.  On March 21, 2011, after their property had already been sold at foreclosure, the plaintiffs were notified in writing that their HAMP modification was denied.

### 5.  BAC's Second Foreclosure Attempt

On July 29, 2010, the plaintiffs and the Substitute Trustee appeared again before the Clerk.  The Substitute Trustee provided evidence of the assignment of the note and deed on the 7.12-acre property from Countrywide Home Loans, Inc. to Countrywide Home Loans Servicing, LP on April 26, 2010, and also showed that Countrywide Home Loans Servicing, LP's name was changed to BAC Home Loans Servicing, LP on April 21, 2010.  The Substitute Trustee also provided an affidavit from an officer, Mary Kist, of an unnamed corporation, which was executed on March 26, 2010, one month before the assignment, swearing that BAC was the holder of the note and indebtedness.  Plaintiffs assert that they attended the foreclosure hearing, and that the Clerk entered an order of sale.  The Clerk's order included findings of fact, stating that BAC Home Loans Servicing, LP was the holder of the note, that the note evidenced a valid debt owed by plaintiff, David L. Hinson, and that the plaintiffs defaulted under the terms of the note.  The plaintiffs were entitled to, but did not appeal the order to the North Carolina Superior Court.  Despite repeated requests that a sale of their property be postponed, the Substitute Trustee sold the plaintiff's property on September 2, 2010.

The property description in the notice of sale for the foreclosure included the entire 7.12-acre tract.  According to a report of sale filed with the Clerk, the property was sold for $399,054.94 and was purchased by BAC.  On September 8, 2010, the plaintiffs received notice

that their property was now owned by Fannie Mae.

The plaintiffs filed their chapter 13 petition on September 13, 2010, within the time period in which debtors can exercise their equity of redemption under North Carolina law, in order to stay the completion of a foreclosure. During preparation for the 341 meeting of creditors, Mr. Hinson re-read the notice of foreclosure hearing, and discovered for the first time that the property description included the entire 7.12-acre tract and not the 2-acre tract.

**B.      Plaintiffs' Complaint**

**1. Count I**

In their complaint, the plaintiffs alleged six claims for relief. Count I is an objection to BAC's proof of claim in the plaintiff's bankruptcy proceeding. To support this objection, the plaintiffs asserted that BAC did not file the necessary documentation to demonstrate that it is the holder of the loan under 11 U.S.C. § 501 and FRBP 3001(c) and (e)(1). Furthermore, they alleged that the filed evidence was defective because the legal description of the property was not attached to the deed at the time that the plaintiffs signed the deed, and additionally that the parties did not intend for the entire 7.12-acre tract to be encumbered.

**2. Count II**

In Count II, the plaintiffs requested that the court order that the deed be stricken and cancelled from the public record as *void ab initio* for violation of the statute of frauds, mistake, and based on the facts set out in the complaint. Alternatively, the plaintiffs requested that the court reform the terms of the deed to reflect the agreed upon 2-acre property that was intended by the parties to secure the loan.

### 3. Count III

Count III alleges that defendants BOA and BAC have engaged in unfair and/or deceptive acts and practices under N.C. Gen. Stat. § 75-1.1, entitling plaintiffs to three times their actual damages plus reasonable attorney's fees pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1. Their stated grounds for relief are the misrepresentation of the identity of the note holder, failing to prove an element required for a power of sale foreclosure, misrepresenting to the Clerk that BAC was the note holder, prosecuting a foreclosure action while a HAMP application was pending in violation of HAMP supplemental directives, imposing and collecting excessive fees not authorized by the loan documents, and treating plaintiffs unfairly and without regard to BOA and BAC's obligation of good faith and fair dealing.

### 4. Count IV

Count IV alleges that defendants BOA and BAC violated their duty of good faith and fair dealing with regards to the plaintiffs' loan modification. The plaintiffs state that BOA and BAC had an implied duty to act in good faith in the performance of the contract between the parties, and that BAC had a statutory duty to act in good faith in the servicing of the mortgage loan pursuant to the Secure and Fair Enforcement Mortgage Licensing Act, N.C. Gen. State. §§ 53-244.110 and 53-244.11 ("SAFE Act"). The plaintiffs allege that these defendants breached those duties by making false representations to the Clerk, failing to process the plaintiffs' HAMP application with reasonable care and diligence, causing delay in processing the HAMP application, imposing unnecessary fees, and willfully acting in a way reasonably calculated to result in foreclosure of the plaintiffs' home.

### 5. Count V

Count V is a claim of negligence against defendant, The Shoaf Law Firm.  The plaintiffs state that The Shoaf Law Firm owed a duty of reasonable care by it and its employees to the plaintiffs in the loan transaction, and a duty to ensure that its employees' actions comported to professional standards of loan closing practices.  According to the plaintiffs, this duty was breached by this defendant's failure to properly ascertain and accomplish the intention of the parties in executing the deed, failure to properly supervise the involved attorney to make sure her actions comported with customary professional standards, failure to attach a legal description of the property to the deed that was tendered to the plaintiffs at the execution, and negligently attaching a description of land that included 7.12-acres rather than 2-acres.  Plaintiffs alleged resulting damages of at least $10,000.00.  Count V is not at issue at this time because The Shoaf Law Firm has not moved to dismiss this claim against them.  Therefore, the court will not further analyze Count V, and it will survive the motion to dismiss.

### 6. Count VI

Count VI is an alternative claim in defense and recoupment against any and all defendants, in the event that any of Counts I through V are barred by a statute of limitations. Count VI was not addressed by the parties in the motions and responses before the court.  At this time, Count VI survives the motion to dismiss.

### C.    Bank Defendants' Motion to Dismiss

On December 7, 2011, the bank defendants filed a motion to dismiss and an accompanying memorandum of law.  The memorandum asserted that Counts I and II of the complaint should be dismissed under Fed. R. Civ. Proc. 12(b)(1) for lack of subject matter

8

jurisdiction, in accordance with the "Rooker-Feldman doctrine," which prohibits lower federal courts from reviewing state court decisions. The memorandum also asserted that the complaint fails under the pleading standard of Fed. R. Civ. Proc. 12(b)(6) for failure to state a claim upon which relief can be granted. Additionally, collateral estoppel would prevent the plaintiffs from re-litigating those claims already adjudicated by the Clerk.

With regards to Count III, the defendants asserted that the unfair and deceptive trade practices claim ("UDTPA claim") fails because Counts I and II fail, and the facts underlying those claims are the same facts used to support the UDTPA claim. Additionally, the defendants assert that it is unclear how any alleged "default-related" fees imposed by the defendants on the plaintiffs could form the basis of a UDTPA claim. Additionally, the deed states that "the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee," and therefore, the fees that BAC charged were not prohibited. Finally, the defendants allege that the plaintiffs cannot successfully assert a separate UDTPA claim based on an alleged breach of contract, because there were no substantial aggravating circumstances, which would be necessary to support such a claim.

The defendants assert that Count IV fails as a matter of law because HAMP does not allow for a private right of action. Furthermore, they assert that the duty of good faith and fair dealing does not apply to the negotiation of a contract. Finally, they state that Count IV fails because N.C. Gen. Stat. §§ 53-244.110 and 53-244.11 do not allow for a private right of action.

## D.    Plaintiffs' Response to Motion to Dismiss

On January 6, 2012, the plaintiffs filed a response to the motion to dismiss asserting that

this court does have subject matter jurisdiction over the plaintiffs' claims pursuant to 11 U.S.C. § § 501, 502, and Fed. R. Bankr. Proc. 3001, which deal with proofs of claim. With regard to Counts I and II, they assert that the Clerk could not have inquired into BAC's standing as a creditor in the bankruptcy proceeding, nor determine the sufficiency of the documents filed to support a proof of claim in bankruptcy, nor could the Clerk resolve issues of title in a foreclosure, and therefore, those issues were not previously adjudicated by the Clerk. Additionally, the plaintiffs seek a determination of the extent of BAC's alleged lien, and assert that the determination of the secured status of a claim is properly brought before this court.

With regards to Counts III, IV, and VI, the plaintiffs state that the resolution of these claims goes to the amount of the claim, if any, to be allowed for BAC/BANA. Pursuant to 11 U.S.C. § 502(b), the plaintiffs assert that this court has the authority to determine the amount of such claim.

The plaintiffs point out that the Clerk's jurisdiction is limited, thus preserving adjudication of the issues in the plaintiffs' complaint for this court. Furthermore, because the Clerk lacked the authority to resolve these issues, the plaintiffs assert that the Rooker-Feldman doctrine does not apply, because that doctrine only covers situations where an issue was or could have been litigated in state court. Finally, the plaintiffs assert that the Clerk's ruling did not settle all controversies between the parties. Under N.C. Gen. Stat.§ 45-21.34, the plaintiffs' right to other legal and equitable relief was preserved while the rights of the parties to the sale were not yet fixed. At the time of the filing of the bankruptcy petition, the rights of the parties to the sale were not yet fixed, and therefore the plaintiffs' right to pursue other forms of relief was preserved.

Next, the plaintiffs assert that their UDTPA claim stated a sufficient cause of action because the details recited by the plaintiffs in their complaint fulfill the elements of a UDTPA claim in that the alleged acts were in commerce, they caused damage to the plaintiffs, and the acts were within the statutory meaning of "unfair" and "deceptive."

Lastly, the plaintiffs assert that their good faith and fair dealing claim states a sufficient cause of action because under N.C. Gen.Stat. § 53-243.111, the plaintiffs have a private right of action against a mortgage lender for a violation of the duty to act in good faith and fair dealing in servicing its loans. The plaintiffs state that the facts alleged in the complaint demonstrate this violation.

## STANDARD OF REVIEW

A pleading which states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. Proc. 8(a)(2); Fed. R. Bankr. Proc. 7008. In determining whether the plaintiff has failed to state a claim upon which relief can be granted, the court must accept as true all pleaded allegations and view the complaint in the light most favorable to the plaintiff. Hatfill v. New York Times Co., 416 F.3d 320, 329 (4th Cir. 2005). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Ashcroft v. Iqbal,129 S. Ct. 1937, 1949 (2009). Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as adopted by the Federal Rules of Bankruptcy Procedure, a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'" Iqbal, 129 S. Ct. at 1949 (2009) (citations and quotations omitted).

Heightening pleading requirements under the Federal Rules of Civil Procedure, the

Supreme Court held that a statement showing entitlement to relief "demands more than an

unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 1949.  A claim is facially

plausible when the facts alleged in the complaint allow the court to draw a "reasonable

inference" that the defendant is liable for the alleged misconduct.  Id.  "[W]here the well-pleaded

facts do not permit the court to infer more than the mere possibility of misconduct, the complaint

has alleged—but it has not 'show[n]'— 'that the pleader is entitled to relief.'" Id. at 1950

(citation omitted).

The burden of proving subject matter jurisdiction on a motion to dismiss under Rule

12(b)(1) is on the plaintiff. Richmond, Fredericksburg & Potomac R.R. v. United States, 945

F.2d 765, 768 (4th Cir. 1991).  The Fourth Circuit has stated that,

> In determining whether jurisdiction exists, the district court is to regard the
> pleadings' allegations as mere evidence on the issue, and may consider evidence
> outside the pleadings without converting the proceeding to one for summary
> judgment.  The district court should apply the standard applicable to a motion for
> summary judgment, under which the nonmoving party must set forth specific facts
> beyond the pleadings to show that a genuine issue of material facts exists.  The
> moving party should prevail only if the material jurisdictional facts are not in dispute
> and the moving party is entitled to prevail as a matter of law.

Id. (citations omitted).

## DISCUSSION

### A.     Counts I and II: the Rooker-Feldman Doctrine and Collateral Estoppel

The bank defendants claim that Count I of the plaintiffs' complaint must be dismissed

under Rule 12(b)(1) based on a lack of subject matter jurisdiction under the Rooker-Feldman

doctrine.  "The Rooker-Feldman doctrine generally prohibits lower federal courts from

12

reviewing state court decisions." <u>Brumby v. Deutsche Bank Nat'l Trust Co.</u>, No. 1:09CV144, 2010 WL 617368, at * 2,  (M.D.N.C. Feb. 17, 2010).  Jurisdiction to review such decisions lies with superior state courts and, ultimately, the United States Supreme Court. <u>Id.</u>  The doctrine extends beyond those issues actually presented to a state court, to also include those issues that are "inextricably intertwined" with a state court decision. <u>Id.</u>  To be "inextricably intertwined,"granting of the relief sought by the plaintiff in the federal complaint must necessarily determine that the state court judgment was "erroneously entered or must take action that would render the judgment ineffectual." <u>Id.</u> (citing <u>Jordahl v. Democratic Party of Va.</u>, 122 F.3d 192, 202 (4th Cir. 1997)).

Here, Count I of the plaintiffs' complaint is an attempt to re-litigate issues that have already been judicially determined in the prior state court foreclosure proceedings or that are inextricably intertwined with the state court foreclosure proceedings, and Count I should therefore be dismissed under the Rooker-Feldman doctrine.  Specifically, the plaintiffs seek a determination of BAC's right to enforce its security interest by filing a proof of claim in this case.  To grant the plaintiffs' requested relief, the court would have to reverse the Clerk's finding in the state court foreclosure proceeding that BAC was the holder of the note and had the authority to foreclose on the note.  The Rooker-Feldman doctrine prevents this court from readjudicating those issues.

The relief requested in Count II is also barred by the Rooker-Feldman doctrine, in so far as the plaintiffs are asking the court to determine that the deed is *void ab initio*.  In the state court foreclosure proceeding, the Clerk established the validity of the deed of trust, precluding this court from having subject matter jurisdiction over this issue.

The doctrine does not, however, bar the plaintiffs' request in Count II for reformation of the deed for mutual mistake. The Clerk made no findings of fact concerning the accuracy of the collateral description of the deed, nor did the Clerk have the authority to do so. Under N.C. Gen. Stat. § 45-21.16(d), a clerk's inquiry is limited to four issues: (1) the existence of a valid debt and whether the foreclosing party is the holder of the debt; (2) whether the debtor has defaulted on the debt; (3) whether the instrument evidencing the debt permits foreclosure; and (4) whether proper notice has been afforded to all entitled parties. In re Watts, 38 N.C. App. 90, 94 247 S.E.2d 427, 429 (N.C. Ct. App. 1978).

The Rooker-Feldmen doctrine only bars those claims that were or could have been litigated in the state court proceedings. The claim for reformation of the deed for mistake could not have been and was not adjudicated by the Clerk, and therefore, the portion of Count II requesting reformation will not be dismissed on these grounds.

The bank defendants also alleged that Counts I and II of the plaintiffs' complaint are barred by collateral estoppel. "[C]ollateral estoppel precludes the subsequent adjudication of a previously determined issue, even if the subsequent action is based on an entirely different claim." Whitacre P'ship v. Biosignia, Inc., 358 N.C. 1, 14, 591 S.E.2d 870, 880 (N.C. 2004). It is not necessary for the court to decide whether collateral estoppel applies to Count I and the part of Count II which the court has already found to be barred by the Rooker-Feldman doctrine. With regards to the request for reformation for mutual mistake in Count II, collateral estoppel does not apply because the issue of mutual mistake was not previously determined by the Clerk.

**B.**     **Count II and Reformation of the Deed for Mistake**

N.C. Gen. Stat. § 45-21.34 provides that:

> Any owner of real estate . . . may apply to a judge of the superior court, prior to the time that the rights of the parties to the sale or resale becoming fixed pursuant to G.S. 45-21.29A to enjoin such sale, upon the ground that the amount bid or price offered therefor is inadequate and inequitable and will result in irreparable damage to the owner or other interested person, *or upon any other legal or equitable ground which the court may deem sufficient*. (emphasis added)**.**

N.C.G.S. § 45-21.34.

 N.C. Gen. Stat. § 45-21.27 states that following a foreclosure sale, the rights of the parties to the sale are not fixed until a period of 10 days has passed, during which time an upset bid can be made. The property at issue was sold in foreclosure on September 2, 2010. The tenth day following the sale was September 12, 2010. However, because September 12th fell on a Sunday, under the Statute, the upset period did not expire until after September 13. N.C.G.S. § 45-21.27(a). The plaintiffs filed for bankruptcy protection on September 13, 2010. Pursuant to 11 U.S.C. § 362, the bankruptcy filing stayed the completion of the foreclosure sale, preventing the rights of the parties from becoming fixed. Therefore, under N.C.G.S. § 45-21.34, the parties are entitled to the legal or equitable relief which the court deems sufficient.

 "Reformation is an equitable remedy where a court rewrites a deed to make it conform to the intention of the parties." In re Law Developers, LLC, No. 08-00965-8-JRL, 404 B.R. 136, 139 (Bankr. E.D.N.C. June 24, 2008) (citing Metro. Prop. & Cas. Ins. Co. v. Dillard, 126 N.C. App. 795, 798, 487 S.E.2d 157, 159 (N.C. Ct. App. 1997)). Reformation can be used where a mutual mistake has resulted in the parties' actual intent not being correctly embodied in the instrument. Id.; see also Strong, *N.C. Index 4th*, Reformation of Instruments § 1. The complaining party has the burden of showing that a material agreement between the parties was incorrectly incorporated into the agreement, and that the true agreement of the parties was mistakenly omitted. In re Law Developers, 404 B.R. at 139.

15

Here, the plaintiffs allege that the inclusion of the entire 7.12-acre tract in the deed does
not reflect the true intention of the parties. Rather, the parties intended for the deed to only
cover the 2-acre tract. The plaintiffs assert that a drafting error by The Shoaf Law Firm is
responsible for the erroneous property description. The plaintiffs' complaint states sufficient
facts to satisfy the pleading standard of F.R.C.P. 12(b)(6). Accordingly, the plaintiffs' claim in
Count II, in so far as it relates to a request for reformation of the deed, will not be dismissed.

## C.    Count III and the UDTP Claim

It is generally undisputed that HAMP does not create a private right of action. Wigod v.
Wells Fargo Bank, N.A., No. 10CV2348, 2011 WL 250501, at *4 (N.D. Ill. Jan. 25, 2011).
However, North Carolina courts have held that violations of a statute designed to protect the
public, and violations of established public policy, may constitute unfair and deceptive practices
under state law, even where the violated statute does not provide for a private right of action.
E.g. Stanley v. Moore, 339 N.C. 717, 723, 454 S.E.2d 225, 228 (N.C. 1995) (concerning
violation of landlord-tenant law under N.C.G.S. § 42-25.6 ); Gray v. North Carolina Ins.
Underwriting Ass'n., 352 N.C. 61, 71, 529 S.E.2d 676, 683 (N.C. 2000) (holding that a violation
of insurance laws under N.C.G.S. § 58-63-15(11), which did not contain a private right of action,
constituted a violation of N.C.G.S. § 75-1.1, because such conduct is "inherently unfair,
unscrupulous, immoral, and injurious to consumers."). Furthermore, several courts have
specifically found that a HAMP violation can create the basis for an unfair and deceptive act
claim under state law. E.g. Boyd v. U.S. Bank, N.A, No. 10 C 3367, 787 F. Supp. 2d 747, 752
(N.D. Ill. Apr. 12, 2011); Morris v. BAC Home Loans Servicing, L.P., Civil No. 1:10-11572-
PBS, 775 F. Supp. 2d 255, 259 (D. Mass. Apr. 4, 2011).

16

Having determined that the lack of a private cause of action under HAMP does not in itself prevent the assertion of a UDTPA claim, the issue remains whether the facts as alleged by the plaintiffs are sufficient to withstand a motion to dismiss this claim under F.R.C.P. 12(b)(6). Under North Carolina law, a violation of the UDTPA is established by showing: 1) there was an unfair or deceptive act; 2) the act was in or affecting commerce; and 3) the act proximately caused actual injury to the plaintiff. N.C.G.S. § 75-1.1; In re Wall-Mahel, Bankr. No. 09-05754-8-JRL, Adv. No. 09-00231-8-JRL, 2010 WL 2901694, at *3 (Bankr. E.D.N.C. July 22, 2010). A deceptive act is one that has the "tendency or capacity to mislead. A deliberate act or bad faith need not be shown." Id. An unfair practice is one that is "unethical or unscrupulous." In re D&B Swine Farms, Inc., Bankr. No. 09-02813-5-JRL, Adv. No. 09-00160-8-JRL, 2010 WL 2206827, at *4 (Bankr. E.D.N.C. May 26, 2010).

Treasury Department directives implementing HAMP provide that within 30 days from the date that an Initial Package is received from a person applying for a HAMP modification, and if the borrower's documentation is complete, the servicer must either "[s]end the borrower a Trial Period Plan Notice[,] or [m]ake a determination that the borrower is not eligible for HAMP and communicate this determination to the borrower in accordance with the Borrower Notice guidance . . . ." U.S. Dep't of Treasury, HAMP Supplemental Directive No. 10-01, at 3 (Jan. 28, 2010). Furthermore, servicers are "generally prohibit[ed] [] from proceeding with a foreclosure sale for any potentially eligible mortgage loan until the borrower has been evaluated for eligibility under HAMP and has been determined to be ineligible or has declined a trial period plan offer." Id. Additionally, "[s]ervicers must use reasonable efforts to contact borrowers facing foreclosure to determine their eligibility for HAMP, including in-person contacts at the

servicer's discretion." U.S. Dep't of Treasury, HAMP Supplemental Directive No. 09-01, at 14 (Apr. 6, 2009). The HAMP Handbook further provides that when a borrower is not approved for a HAMP modification, the servicer must provide a Non-Approval Notice, stating the reasons for non-approval, and also prohibits a foreclosure from being conducted within 30 days after the date when the Notice is given, or any longer period required to review responsive materials provided by the borrower. Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, Version 1.0, 2.3.2 Non-Approval Notices, at 24 (Aug. 19, 2010). Lastly, a foreclosure cannot proceed until "all other available loss mitigation alternatives have been exhausted and a non-foreclosure outcome could not be reached," and the servicer must provide a written certification to the clerk presiding over the foreclosure hearing of its efforts to pursue such alternatives. Id. at 27.

HAMP was created to "stabilize the housing market and help struggling homeowners get relief and avoid foreclosure." Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages, Version 1.0, Forward, at 6 (Aug. 19, 2010). As such, it is clearly a statute designed to protect the public and is also one which establishes public policy in favor of protecting struggling homeowners. Violations of the agency directives implementing HAMP can constitute the type of unfair or unscrupulous behavior which N.C.G.S. § 75-1.1 seeks to prevent.

Plaintiffs have alleged that defendants BOA and BAC did not timely process their HAMP application and did not provide timely and proper notice concerning the status of their application. They allege that the defendants provided false and misleading information regarding their HAMP application. Furthermore, these defendants instituted foreclosure

proceedings before the plaintiffs' HAMP modification had been denied, and without timely

providing reasons for the denial of the modification.  The defendants certified to the Clerk that

they had pursued all available alternatives to the foreclosure proceeding.  The facts alleged by

the plaintiffs, if true, would mean that this certification was false.

The plaintiffs have alleged facts which would show that they were proximately harmed as

a result of these actions through the foreclosure of their home and the imposition of default

related fees. The bank defendants, acting as lenders and mortgage servicers clearly engaged in

acts in or affecting commerce.  The bank defendants' actions and violations of HAMP policies

and procedures, as alleged by the plaintiffs, are within the meaning of "unfair" and "deceptive."

The plaintiffs have alleged sufficient facts, which accepted as true, state a claim upon which

relief can be granted under N.C.G.S. § 75-1.1, and thus withstands the motion to dismiss.

Any of the plaintiffs' claims in Count III of the complaint that relate to the identity of the

note holder are barred for the reasons stated in the court's discussion of Count I.

**D.      Count IV: Violation of the Duty of Good Faith and Fair Dealing**

**1. Implied Duty of Good Faith and Fair Dealing in Contracts**

The plaintiffs allege several grounds for their claim of a violation of the duty of good

faith and fair dealing.  First, they claim that defendants BOA and BAC owed the plaintiffs an

implied duty of good faith and fair dealing arising from the parties' mortgage contract.  Under

North Carolina law, "[i]n every contract there is an implied covenant of goof faith and fair

dealing that neither party will do anything which injures the right of the other to receive the

benefits of the agreement." Sunset Beach Development, LLC v. Amec, Inc., 196 N.C. App. 202,

217, 675 S.E.2d 46, 57 (N.C. Ct. App. 2009) (citing Bicycle Transit Authority v. Bell, 314 N.C.

19

219, 228, 333 S.E.2d 299, 305 (N.C. 1985)).  This implied duty does not apply to the negotiation of a contract, before the actual execution of the contract. <u>Static Control Components v. Mitsubishi Kagaku Imaging Corp.</u>, No. 1:06CV00154, 2007 WL 586710, *2 (M.D.N.C. Feb. 21, 2007).

The defendants had no implied duty of good faith and fair dealing in the negotiation of a loan modification with the plaintiffs, because these negotiations obviously took place before a modified contract existed.  However, during the time that the plaintiffs attempted to negotiate a HAMP modification, their loan servicing contract with BOA and/or BAC was still in effect.  To the extent that the defendants' actions hindered the plaintiffs' ability to receive the benefits of their existing loan service contract with the defendants, this claim will withstand the motion to dismiss, on the grounds that the defendants violated an implied duty of good faith and fair dealing under their existing contract.

The alleged HAMP violations may serve as further evidence of an implied duty of good faith and fair dealing in the existing contract between BOA and/or BAC and the plaintiffs, as a result of the Servicer Particpation Agreement ("SPA"), to which all banks electing into HAMP must agree.  As part of the Emergency Economic Stabilization Act of 2008 ("Act"), Congress created the Troubled Asset Relief Program ("TARP"), under which banks received federal funds, subject to certain conditions.  The Act required that the Secretary of the Treasury implement a plan to assist homeowners and encourage mortgage servicers to participate in programs minimizing foreclosures. Pub. L. No. 110-343,  §§ 101, 109 (2008).

HAMP was born from this directive.  HAMP creates a system whereby the government subsidizes the cost of mortgage modiciations on lenders, in exchange for the servicers'

participation in a standardized process for mortgage modification.  To opt into HAMP, a servicer

must execute an SPA. <u>Parker v. Bank of America, NA</u>, Civil Action No. 11-1838, at *4-5, 29

Mass. L. Rptr. 194 (Mass. Sup. Ct. Dec. 16, 2011).  Under the SPA, there are several events

triggering default, including if the servicer

> commits a grossly negligent, willful or intentional, or reckless act (including but
> not limited to, misrepresentation or fraud) in connection with any of the Programs
> . . . [a]ny represenatiion, warranty or covenant made by Servicer in the Agreement
> or any Certification is or becomes materially false, misleading, incorrect, or
> incomplete, . . . [or Freddie Mac finds] that the Servicer's performance under any
> performance criteria established pursuant to applicable Program Documentation is
> materially insufficient, or any failure by Servicer to comply with any directive
> issued by Fannie Mae or Freddie Mac with respect to documents or data
> requested, findings made, or remedies established, by Fannie Mae and/or Freddie
> Mac in conjunction with such performance criteria or other Program
> requirements.

Home Affordable Modification Program Administrative Website for Servicers, Commitment to

Purchase Financial Instrument and Servicer Participation Agreement, at 6,

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/servicerparticipationagreemen

t.pdf.

At least two courts have held that a violation of an SPA would create a third-party cause

of action for breach of contract, in favor of the mortgagee - the intended beneficiary of the

contract.  <u>Parker</u>, Civil Action No. 11-1838, at *4-5; <u>Marques v. Wells Fargo Home Mortg., Inc.</u>,

Civ. No. 09-cv-1985-L(RBB), at *7, 2010 WL 3212131 (S.D.Cal. Aug. 12, 2010); <u>but see</u>

<u>Markle v. HSBC Mortgage Corp. (USA)</u>, 10-40189-FDS (D. Mass. July 12, 2011) (denying

third-party cause of action).  The court does not address at this time whether a violation of an

SPA would create a third-party cause of action in favor of the plaintiffs.  However, the SPA

imposed contractual duties on the bank defendants in their dealings with people seeking HAMP

modifications. These duties applied during the time period when the plaintiffs were seeking a HAMP modification and serve as further evidence of the defendants' lack of good faith and fair dealing under their existing contract with the plaintiffs.

The plaintiffs alleged that the defendants gave the plaintiffs false information on numerous occasions, requested duplicative and/or unnecessary information from the plaintiffs, foreclosed on a 7.12-acre property while the agreed-upon property was 2 acres, and did not follow several HAMP policies and procedures concerning a servicer's obligations while a HAMP request is pending or once it has been denied. The ultimate result of these actions was the foreclosure of the plaintiffs' property, which goes to the very essence of the benefit which the plaintiffs sought by entering into their existing mortgage contract with the defendants. The plaintiffs have alleged sufficient facts to show that an implied duty of good faith and fair dealing existed and that the duty was breached, in order to withstand the motion to dismiss.

### 2. S.A.F.E. Act and a Statutory Duty of Good Faith and Fair Dealing.

N.C. Gen. Stat. § 53-243.11 of the Secure and Fair Enforcement Mortgage Licensing Act ("S.A.F.E. Act") makes the following conduct unlawful for any mortgage loan servicer:

> (1) To misrepresent or conceal the material facts or make false promises likely to influence, persuade, or induce an applicant for a mortgage loan or a mortgagor to take a mortgage loan, or to pursue a course of misrepresentation through agents or otherwise.
> (8) To engage in any transaction, practice, or course of business that is not in good faith or fair dealing or that constitutes a fraud upon any person in connection with the brokering or making or servicing of, or purchase or sale of, any mortgage loan.
> (14) To fail to comply with applicable State and federal laws and regulations related to mortgage lending or mortgage servicing.

N.C.G.S. § 53-243.11 (1), (8) and (14).

There are conflicting opinions on whether this statute, along with N.C.G.S. § 53-243.10,

create a private right of action, and if so, the extent of that right. Compare <u>Guyton v. FM</u>

<u>Lending Services, Inc.</u>, 199 N.C. App. 30, 43-44, 681 S.E.2d 465, 475-76 (N.C. Ct. App. 2009)

with <u>Thompson v. Bank of America</u>, No. 7:09-CV-89-H, 2011 WL 1253163, at *2 (E.D.N.C.

March 30, 2011).  The court need not address the merits of these divergent approaches at this

time because it has already determined that the implied duty of good faith and fair dealing in

contracts, detailed above, creates a sufficient basis for Count IV to withstand the motion to

dismiss.  Even if N.C.G.S. §§ 53-243.11 and 53-243.10 do not allow for a private right of action,

violations of this statute may serve as evidence of the breach of the implied duty of good faith

and fair dealing in a contract.

## CONCLUSION

Based on the foregoing, the defendants' motion to dismiss Count I and the portion of

Count II detailed herein are **ALLOWED**.  Defendants' motion to dismiss Counts III, IV, and the

portion of Count II regarding reformation of the deed is **DENIED.**


**END OF DOCUMENT**